IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Susan R. Hilton,                                   )<br>                              )<br>                    Plaintiff,        )<br>                              )<br>          vs.                     )<br>                              )<br>Michael J. Astrue,                          )<br>Commissioner of Social Security,       )<br>                              )<br>                    Defendant.      )<br>_____ ) | Civil Action No. 6:10-2012-CMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on January 30, 2007, alleging that she became unable to work on April 30, 2006. The applications were denied initially and on reconsideration by the Social Security Administration. On September 25, 2007, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and a vocational expert appeared on April 13, 2009, considered the case *de novo*, and on

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

August 18, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.   The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on June 14, 2010.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2.  The claimant has not engaged in substantial gainful activity since April 30, 2006, the alleged onset date. (20 C.F.R. § 404.1571, *et seq.* and 20 C.F.R. § 416.971, *et seq.*)

3.   The claimant has the following severe impairments: depression and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that due to pain and fatigue from side effects of medication and depression, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with nonexceptional limitations. The claimant can:  lift/carry 20 pounds occasionally and 10 pounds frequently; walk/stand up to 6 of 8 hours with normal breaks; and sit for up to 6 of 8 hours.  The claimant possesses the concentration necessary for unskilled work, and has diminished ability to interact with peers, coworkers and supervisors on a consistent basis, but the claimant could work in isolation.

2

6.  The claimant is unable to perform any past relevant work. (20 C.F.R. §§ 404.1565 and 416.965).

7.  The claimant was born April 26, 1970 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 C.F.R. §§ 404.1563 and 416.963).

8.  The claimant has limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2006 through the date of this decision. (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.   An examiner must consider whether the claimant (1)  is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can

4

perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

Treatment notes from Don Bryant, M.D., show that he provided routine medical treatment to the plaintiff for upper respiratory issues, allergies, malaise, anxiety, depression, and aches and pains with medications including Xanax (anti-anxiety

5

medication), Zoloft (anti-depression medication) and Lortab (narcotic pain medication) (Tr. 295-301). On June 6, 2005, the plaintiff reported to Dr. Bryant that she was chronically nervous and depressed and that the multiple anti-depressants she had tried in the past had caused side effects. The plaintiff said the only thing that helped her function during the day was the use of Xanax, but Dr. Bryant discussed with her the fact that Xanax was not an appropriate long-term medication. He observed the plaintiff had multiple family problems and multiple areas of stress in her life, but Dr. Bryant did not think she would be a good candidate for counseling because of her poor insight (Tr. 295). Treatment notes from Dr. Bryant dated September 1, 2005, state there had been no change in her overall condition, but the plaintiff remained convinced that she could not work because of her nerves and depression. Dr. Bryant observed that there was "no medical reason either psychiatrically or physically that this patient cannot work and function in a workplace environment. I have discussed this with her." Dr. Bryant planned to taper the plaintiff off her medications because none of them were appropriate for long-term use. He also encouraged the plaintiff to diet and exercise because a change in her normal activities during the day would be of significant benefit to her (Tr. 291).

On December 31, 2005, Dr. Bryant commented he thought the plaintiff would experience significant improvement in terms of her anxiety and depression if she would exercise on a regular basis. The plaintiff stated she could not exercise because of her back pain, but Dr. Bryant stated that this had been evaluated in the past and no significant abnormalities had been found (Tr. 287).

Treatment notes from Dr. Bryant dated March 14, 2006, state that the plaintiff reported she was "doing reasonably well at this time" (Tr. 281). The plaintiff appeared alert and in no distress (Tr. 278). She had appropriate judgment and insight, she was fully oriented, and her recent and remote memory were intact. Dr. Bryant observed no abnormalities in her physical examination (Tr. 279).

6

On September 18, 2006, the plaintiff told Dr. Bryant that she continued to experience significant anxiety, depression, difficulty sleeping, and generalized malaise. Dr. Bryant advised the plaintiff that she should not continue long-term usage of controlled substances because they could potentially damage her liver and kidneys. The plaintiff insisted that this medication was the only thing that helped maintain her semi-normal routine. Dr. Bryant again heavily stressed the importance of exercise (Tr. 324). The plaintiff had a normal physical examination (Tr. 325). Her mood was anxious and she had a blunted affect, but she was fully oriented with appropriate insight and judgment and intact memory (Tr. 326).

The plaintiff presented to Dr. Bryant on November 9, 2006, requesting refills of her medications. The plaintiff complained of continued back pain, leg pain, neck pain, and arm pain, and Dr. Bryant again encouraged her to diet and exercise (Tr. 321). The plaintiff had no changes in her examination findings (Tr. 322).

On January 29, 2007, the plaintiff told Dr. Bryant that her medications had "continued to be of significant help to her and maintaining a normal lifestyle." Dr. Bryant again discussed with the plaintiff "the multitude of problems associated with long-term usage" of her medications (Tr. 317). On examination, the plaintiff's mood was anxious and she had a blunted affect, but she was fully oriented with appropriate insight and judgment and intact memory (Tr. 319). Dr. Bryant refilled the plaintiff's Xanax, Zoloft and Lortab (Tr. 320).

The plaintiff presented to the emergency room on February 10, 2007, complaining she had been feeling weak and fatigued for the previous few weeks. The plaintiff reported that she had crying spells and no energy. She said that her doctor had recently increased her dosage of Xanax. On examination, the plaintiff had a distressed affect (Tr. 213). She was alert with normal speech. Laboratory testing was unremarkable. Emergency room physician, David Turner, M.D., diagnosed depression and weakness

7

secondary to depression.  He advised the plaintiff to increase her dose of Zoloft and to follow up with her doctor (Tr. 214).

On March 27, 2007, the plaintiff consulted with psychiatrist A.M. Bamashmus, M.D., for evaluation of depression and anxiety.  The plaintiff said she had experienced symptoms of depression and anxiety for seven years.  She stated she had lost 50 pounds over the past six months.  On examination, the plaintiff was alert and fully oriented.  Her mood was depressed.  The plaintiff had intact recent and remote memory and her thought processes were logical and goal directed.  The plaintiff showed no evidence of delusions or suicidal and homicidal ideations.  The plaintiff's cognition was intact and her judgment and insight were "fair" (Tr. 220).  Dr. Bamashmus diagnosed major depression, recurrent with premorbid anxiety.  Dr. Bamashmus adjusted the plaintiff's psychotropic medications by taking her off Zoloft and adding Cymbalta (anti-depressant) and Lamictal (mood stabilizing medication) (Tr. 221).

When the plaintiff returned to Dr. Bamashmus on April 10, 2007, she was without any complaints.  She reported she was doing fairly well and was less depressed and anxious.  The plaintiff's mood was good and her affect was broad.  The plaintiff was "pleased" with her progress (Tr. 222).

Eight days later, on April 18, 2007, Spurgeon N. Cole, Ph.D., performed a consultative examination of the plaintiff in connection with her application for benefits.  The plaintiff presented with slightly slowed psychomotor activity, and her movements were slightly slowed.  The plaintiff had a very sad expression on her face and was tearful through most of the evaluation.  The plaintiff was able to supply basic information without difficulty, her speech was clear, and she had satisfactory communication and social skills.  Dr. Spurgeon estimated that the plaintiff had average to low-average cognitive ability.  The plaintiff reported she had been depressed for years and that her disability was because of depression and anxiety (Tr. 223).  The plaintiff said she had been separated from her

8

husband for about two months because of her depression. The plaintiff indicated that she typically kept a job for only a few months at a time because she would get depressed and quit. She noted that Dr. Bamashmus had recently changed her medications, which helped "marginally." The plaintiff was oriented with normal speech, goal directed thought processes, and only slightly slowed speech. The plaintiff's concentration appeared adequate, and she also appeared to have adequate cognitive functioning (Tr. 224). The plaintiff said her daily activities included getting her children up and off to school, shopping when she has to, talking on the phone, watching television, and taking care of her own personal hygiene. The plaintiff reported she did not like being around others, although she always got along well with others when she worked. Dr. Cole observed that the plaintiff had a "certain degree of learned helplessness about her" (Tr. 225). He stated the plaintiff did appear to be genuinely depressed. Dr. Cole assessed major depression and personality disorder (Tr. 226).

On May 31, 2007, Craig A. Horn, Ph.D., a State agency psychologist, reviewed the plaintiff's record and determined that her affective disorder and personality disorder resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 227-37). Dr. Horn completed a mental residual functional capacity assessment finding the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions and the ability to interact appropriately with the general public (Tr. 241-42). In the functional capacity assessment, Dr. Horn found the plaintiff was able to understand and remember short and simple instructions, make simple work-related decisions, ask simple questions, and respond appropriately to changes in a routine setting, but would perform best in situations not requiring ongoing interaction with the public (Tr. 243).

9

The plaintiff returned to Dr. Bamashmus on June 12, 2007. She reported that she was without any complaints. Dr. Bamashmus observed that her mood was good, her affect was broad, and she was doing "fairly well" on her medications. Dr. Bamashmus adjusted the plaintiff's Klonopin (anti-anxiety medication) in response to her complaints of anxiety symptoms (Tr. 247).

On August 6, 2007, Xanthia Harkness, Ph.D., another State agency psychologist, reviewed the plaintiff's record and determined that her affective disorder and personality disorder resulted in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 251-61). Dr. Harkness completed a mental residual functional capacity assessment finding the plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public (Tr. 265-66). In the functional capacity assessment, Dr. Harkness said the plaintiff was able to understand and remember short and simple instructions, complete a normal workday and workweek, make simple work-related decisions, ask simple questions, sustain appropriate interaction with peers and co-workers, and respond appropriately to changes in a routine setting, but should not be in constant contact with the general public (Tr. 267).

Treatment notes from Dr. Bamashmus dated September 17, 2007, state that the plaintiff had "done wonderful on the Cymbalta and Klonopin combination. No anxiety, depression, manic, or psychotic symptoms." Dr. Bamashmus noted the plaintiff seemed stable (Tr. 273).

On October 8, 2007, Dr. Bamashmus completed a form stating the plaintiff had fair[2] ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember, and carry out complex, detailed, and simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Dr. Bamashmus stated the plaintiff had good ability use judgment. He observed that the plaintiff was doing better on her current medications (Tr. 269-70).

Treatment notes from Dr. Bamashmus dated January 14, 2008, state that the plaintiff complained she was not doing well and her mood was not good. The plaintiff stated that she could not function and had not been able to keep a job. Dr. Bamashmus noted the plaintiff was tearful and emotional and had lability of mood, mood swings, rage, and emptiness. Dr. Bamashmus opined this was "part of Axis II, Borderline Personality Traits vs. Disorder." He adjusted the plaintiff's medications and planned to monitor her (Tr. 272).

The plaintiff presented to Dr. Bryant's nurse practitioner, Sherri Creek, APRN, on February 20, 2008, complaining of congestion. Ms. Creek noted that the plaintiff had also had a gradual onset of hypertension, but was tolerating her anti-hypertensive medication well. On examination, the plaintiff had no abnormalities (Tr. 312-13). Ms. Creek continued the plaintiff's medications (Tr. 313).

When the plaintiff returned to Dr. Bryant on November 6, 2008, she reported that she had been able to taper off of Xanax. Dr. Bryant encouraged the plaintiff to taper off of Lortab as well. The plaintiff complained of continued significant anxiety, depression, and malaise "related to her multitude of family problems" (Tr. 308). The plaintiff's mood was anxious and she had a blunted affect, but she was fully oriented with appropriate

---

[2]The definition of "fair" on this form is "ability to function in this area is seriously limited but not precluded" (Tr. 269).

insight and judgment and intact memory. Dr. Bryant diagnosed generalized anxiety disorder and atypical depressive disorder (Tr. 310). He refilled her medications and provided a Decadron injection (Tr. 311).

Treatment notes from Dr. Bryant dated March 16, 2009, state that the plaintiff reported she had been able to remain off Xanax, but she was becoming increasingly anxious "concerning a large number of problems." Dr. Bryant recommended she take Klonopin rather than Xanax and Cymbalta rather than Lortab (Tr. 304). The plaintiff's examination showed her mood was anxious and she had a blunted affect, but she was fully oriented with appropriate insight and judgment and intact memory (Tr. 306). Dr. Bryant adjusted the plaintiff's medications (Tr. 307).

### Plaintiff's Statements and Testimony

At the hearing held on April 13, 2009, the plaintiff testified that she stopped working in April 2006 because her depression and anxiety got worse (Tr. 24). The plaintiff stated that the Klonopin she took for her anxiety made her drowsy and that she could not function. She reported she felt weak, had no energy, and did not like to go out in public because she felt like people were talking about her. The plaintiff stated that she cried four or five times a day for no particular reason (Tr. 26). She reported she did not drive much because she felt too weak and did not want to go anywhere (Tr. 27). The plaintiff said she stopped seeing Dr. Bamashmus because of financial restraints. She testified that she spent most days in her bedroom in the dark and that her husband did the grocery shopping and cooking and cared for her children (Tr. 28). The plaintiff reported that stress made her depression worse, that she had difficulty remembering things, and she could bathe and dress her self "very few times" (Tr. 29). The plaintiff testified that her husband had to put her in the tub, wash her, and dress her. She also complained of arthritis in her hands and said she had headaches (Tr. 30-31).

***Vocational Expert's Testimony***.

Vocational expert Robert E. Brabham, Jr., also testified at the April 2009 hearing. The ALJ asked Mr. Brabham to assume a hypothetical individual of the plaintiff's age, education, and work experience, capable of a wide range of light work . In the area of sustained concentration, there would be the concentration necessary for unskilled work; in the area of social interaction, this person would have diminished ability to interact appropriately with peers, co-workers, and the general public on a consistent basis but could work in relative isolation (Tr. 32-33). Mr. Brabham testified that such an individual could not perform the plaintiff's past relevant work but could perform the representative unskilled light[3] jobs of machine tender (20,000 jobs locally and 800,00 nationwide), garment folder (1,000 jobs locally and 39,000 jobs nationwide), and hand packer (10,000 jobs locally and 375,000 jobs nationwide).

***Commissioner's Final Decision***.

In his August 18, 2009, decision, the ALJ found at the first step of the sequential evaluation process that the plaintiff had not engaged in any substantial gainful activity since her alleged onset of disability date (Tr. 11). At the second step of the evaluation process, the ALJ determined that the plaintiff's depression and anxiety were severe impairments (Tr. 11). At the third step of the evaluation process, the ALJ found that plaintiff's impairments did not meet or medically equal the criteria of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Tr. 12-13). The ALJ also found that the plaintiff's allegations regarding her limitations were not totally credible (Tr. 14-15). The ALJ next determined that the plaintiff retained the residual functional capacity to perform light work and possessed the concentration necessary for unskilled work, had diminished ability to interact with peers, coworkers, and supervisors on a consistent basis, but could work in

---

[3]*See* 20 C.F.R. § 404.1567(b) (light work definition).

13

isolation (Tr. 14). The ALJ found the plaintiff's limitations would preclude her past relevant work (Tr. 15), but that she could perform the unskilled light jobs of parts machine tender, garment folder, and hand packer, and that these job existed in significant numbers (Tr. 16). Accordingly, the ALJ concluded that the plaintiff was not disabled under the Act (Tr. 16).

**ANALYSIS**

The plaintiff alleges that the ALJ's decision is not based upon substantial evidence, and the ALJ erred by (1) failing to properly consider the opinions of treating physicians Dr. Bamashmus and Dr. Bryant; (2) failing to properly evaluate her subjective complaints; and (3) failing to give proper consideration to the testimony of the vocational expert.

### *Treating Physicians*

The plaintiff argues the ALJ did not properly evaluate the opinions of Drs. Bamashmus and Bryan (pl. brief at 5-11). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2);

14

*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On October 8, 2007, Dr. Bamashmus, a psychiatrist who treated the plaintiff from March 2007 to January 2008 (Tr. 27), completed a form stating the plaintiff had fair[4] ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember, and carry out complex, detailed, and simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Dr. Bamashmus stated the plaintiff had good ability use judgment. He observed that the plaintiff was doing better on her current medications (Tr. 269-70).

The ALJ considered Dr. Bamashmus' opinion and found as follows:

> The Administrative Law Judge notes that the claimant had been noted by Dr. Bamashmus to be doing extremely well and to be stable on medication until January 2008. The Administrative Law Judge does not give this opinion controlling weight because of its conclusory nature and because it is against the weight of the record as a whole. The Administrative Law Judge

---

[4]The definition of "fair" on this form is "ability to function in this area is seriously limited but not precluded" (Tr. 269).

15

> acknowledges the claimant has severe mental impairments, but finds insufficient evidence to support a finding of disability, and the above residual functional capacity addresses the claimant's limitations.

(Tr. 15).

The plaintiff argues that the ALJ failed to properly consider Dr. Bamashmus' opinion in that he failed to provide any examples of how the opinion conflicted with other evidence in the record, he did not detail the required factors set forth in 20 C.F.R. § 404.1527 to determine the weight to be given to the opinion, and he failed to state what weight, if any, he gave the opinion. The plaintiff argues: "By not stating what weight the ALJ gave to Dr. Bamashmus' opinion, one can only assume the ALJ found his opinion worthy of no weight whatsoever. This seems a remarkable result considering the fact that Dr. Bamashmus indisputably treated Claimant as a psychiatrist for mental problems, which the ALJ concedes are severe" (pl. brief at 11). The Commissioner argues that an express discussion of each factor is not required since the ALJ demonstrated that he applied the factors and provided good reasons for his decision (def. brief at 13-14).

This court agrees with the plaintiff that the ALJ failed to properly consider Dr. Bamashmus' opinion as the ALJ did not state what weight, if any, was given to the opinion, and the ALJ failed to cite evidence conflicting with the opinion. Upon remand, the ALJ should be instructed to evaluate Dr. Bamashmus' opinion in accordance with the above-stated law.

The plaintiff next argues that the ALJ erred in failing to discuss Dr. Bryant's treatment notes in his residual functional capacity ("RFC") analysis. Dr. Bryant was the plaintiff's family physician since 1999 (Tr. 25) and treated the plaintiff for allergies, backache, generalized anxiety disorder, atypical depressive disorder, and pain in her leg (Tr. 278-332). The Commissioner counters that in adopting the State Agency reviewing physicians' opinions, the ALJ "accomplished in substance what the plaintiff complains of:

a thorough review of the Plaintiff's treatment records" (def. brief at 16). However, given that Dr. Bryant treated the plaintiff for several years for anxiety and depression (*see* Tr. 299-302), which were found to be severe impairments, this court agrees with the plaintiff that the ALJ erred in failing to consider and discuss such evidence in the RFC analysis, and the ALJ should be instructed to do so upon remand.

### Subjective Complaints

The plaintiff next argues that the ALJ failed to properly consider her subjective complaints. This court agrees. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .
> It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to

17

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ found as follows with regard to the plaintiff's credibility:

At the hearing, the claimant testified she has some side effects of medication. . . . Celebrex causes diarrhea and klonopin causes drowsiness and she cannot function on it. She took her medication before coming to the hearing. She has weakness and fatigue, cries multiple time daily, does not want to go out into public, and she does not go anywhere unless she must. She stopped seeing her psychiatrist for financial reasons. She stays in the dark in her bedroom all day. Her husband does household chores, shopping, and caring for children. She does nothing. She has trouble with stress and memory. She must make notes to remember what needs to be done. She is rarely able to bathe and dress due to weakness and fatigue. She

18

gets dressed 2 out of 7 days. She has itchy tingly hands and chronic leg and back pain. She gets frequent headaches.

After careful consideration of the evidence, the undersigned finds that the claimant's medical determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Although the claimant has described daily activities which are fairly limited, two factors weight against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence, which had indicated great improvement of psychiatric condition on medication.

(Tr. 14-15).

As argued by the plaintiff, there is no requirement that there be objective verification of limited daily activities. Because the plaintiff's complete medical record demonstrates "objective medical evidence of [multiple] condition[s] that could reasonably be expected to produce the [symptoms] alleged" she is not required to demonstrate "medical evidence of the [symptoms] itself." *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990) (interpreting 42 U.S.C. § 423(d)(5)). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

The only other reason given by the ALJ for discrediting the plaintiff's credibility was that the medical evidence indicated "great improvement of psychiatric condition on medication" (Tr. 15). However, the record reveals that the "great improvement" cited by the ALJ is overstated. The plaintiff presented to the emergency room on February 10, 2007, complaining she had been feeling weak and fatigued for the previous few weeks. The plaintiff reported that she had crying spells and no energy. She said that her doctor had recently increased her dosage of Xanax. On examination, the plaintiff had a distressed affect (Tr. 213). The emergency room physician diagnosed depression and weakness secondary to depression. He advised the plaintiff to increase her dose of Zoloft and to follow up with her doctor (Tr. 214). The report from the initial visit with her treating psychiatrist, Dr. Bamashmus, on March 27, 2007 notes her seven year history of battling anxiety and depression (Tr. 220). Dr. Bamashmus changed the plaintiff's medications and reported improvement in her condition (Tr. 222, 247, 273). However, by January 14, 2008, the plaintiff was complaining of not doing well and her condition was deteriorating (Tr. 272). Due to financial problems, she had to return to her family physician for treatment of her mental impairments. Dr. Bryant's notes dated March 16, 2009, the last record in the transcript, show that he was again changing her medications to better control her depression and anxiety (Tr. 304-307).

The Commissioner also argues that the plaintiff received only conservative treatment for her allegedly disabling impairments and that her testimony regarding her daily activities was inconsistent with what she told Dr. Cole in April 2007 (def. brief at 17; *see* Tr. 225). While such considerations are certainly important to a credibility analysis, the Commissioner's argument is a *post-hoc* rationalization not offered by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The plaintiff further contends that the ALJ failed to consider certain evidence that supported her credibility.  Specifically, the plaintiff notes that she lost 50 pounds in six months (Tr. 220).  She visited her family physician and psychiatrist on a consistent basis for complaints of pain, depression, and fatigue, and she was prescribed several medications for depression, anxiety, pain, high blood pressure, and arthritis (Tr. 177-78).  Furthermore, Dr. Cole, a consultative examiner, specifically determined that "[o]n the Rey's Test of Malingering, [the plaintiff] performed well indicating that she is not attempting to promote symptoms" (Tr. 223).

Based upon the foregoing, upon remand, the ALJ should be instructed to evaluate the plaintiff's credibility in accordance with the above-stated law.

### Vocational Expert Testimony

Lastly, the plaintiff argues that the ALJ failed to give proper consideration to the testimony of the vocational expert that there were no jobs available in the local or national economy that she can perform with her combination of exertional and nonexertional impairments (pl. brief at 20-22).  "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

At the hearing, the ALJ asked two hypothetical questions of the vocational expert.  The first hypothetical assumed the following facts: an individual 38 years of age, ninth grade education, wide range of light work due to assertions of some back pain and joint pains (Tr. 32); nonexertional limitations include concentration necessary for unskilled work, diminished ability to interact appropriately with peers and coworkers and the general public on a consistent basis but could work in relative isolation (Tr. 32-33).  Based upon these assumed facts, the vocational expert determined there were jobs available in the local

and national economy (Tr. 33).  This is the testimony relied upon by the ALJ in finding that there are jobs that exist in significant numbers in the national economy that the plaintiff can perform (Tr. 16).

The ALJ's second hypothetical to the vocational expert assumed the following: same vocational factors as in the first hypothetical, but, in the area of concentration, the individual would possess approximately 20 percent reduction in concentration capability on a consistent basis with the diminished ability to interact appropriately with peers and coworkers and the general public and the transaction of even unskilled work (Tr. 33-34); also, this individual would have an inability to respond appropriately to changes in the work setting on a consistent basis (Tr. 34).  Upon these facts, the vocational expert testified that no work would be available for such an individual because "[a] loss of concentration of 20 percent or one-fifth of the workday is, that's just not consistent with gainful employment of virtually any skill or exertional level" (Tr. 34).

The Commissioner contends that the first hypothetical accurately described the plaintiff's limitations as found credible by the ALJ, and thus the ALJ appropriated relied upon the vocational expert's response to that question.  As discussed above, however, this court finds that the ALJ failed to properly evaluate the opinion of the plaintiff's treating psychiatrist, Dr. Bamashmus, who opined that the plaintiff had only a "fair" ability to "maintain attention/concentration," where "fair" was defined as "ability to function in this area is seriously limited, but not precluded" (Tr. 269).  Also, non-examining state agency consultant, Craig Horn, Ph.D., noted the plaintiff had "moderate" difficulties in maintaining concentration, persistence, or pace (Tr. 237).  Furthermore, this court has recommended that the ALJ be instructed to include Dr. Bryant's treatment records in the RFC analysis and to re-evaluate the plaintiff's credibility.  Accordingly, the ALJ should be further instructed to reconsider at step five of the sequential evaluation process whether the plaintiff is able to

do any jobs that exist in significant numbers in the national economy and to obtain further vocational expert testimony if needed in that determination.

### **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


                                         s/ Kevin F. McDonald
                                         United States Magistrate Judge

October 12, 2011

Greenville, South Carolina

23